

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOVAN'Z SMITH,                          No.  2:11-cv-3312 MCE GGH P

12                  Petitioner,

13        v.                                 FINDINGS & RECOMMENDATIONS

14   KEN CLARK, Warden,

15                  Respondent.

16

17          Petitioner is a state prisoner proceeding in forma pauperis and through counsel with a

18   petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the

19   constitutionality of his 2009 conviction and resulting sentence for assault on a child causing death

20   (Cal. Penal Code § 273ab).  Resp't's Lod. Ex. No. 1, Clerk's Transcript on Appeal, at 284.[1]

21   Petitioner contends that the trial court violated his constitutional rights by admitting into evidence

22   statements from petitioner that were obtained during a custodial interrogation in which he was not

23

24   _____

     [1]       The five exhibits first lodged with this Court, in support of respondent's answer and
25   supporting memorandum, were not numbered.  Resp't's Notice of Lod. Exs., ECF No. 21-2.
     Subsequently, two exhibits were lodged with this court, which were assigned letters.  Resp'ts
26   Notice of Lod. Exs., ECF No. 25.  In the interest of clarity, this Court will assign numbers for
     these exhibits in the order they were received and are listed in the Notices of Lodged Exhibits.  In
27   his answer, respondent follows the same methodology for the first five exhibits filed with this
     Court.  See Resp'ts Answer, ECF No. 21-1, 21-2.  This court will assign the subsequently lodged
28   exhibits numbers 6 and 7, respectively.  ECF No. 25.

                                                1

1    properly advised of his right to remain silent or obtain a lawyer.

2            Upon careful consideration of the record and the applicable law, especially AEDPA, the

3    court concludes in this close case:

4        1.  If petitioner's age is considered in the objective "in custody" analysis, the determination

5            by the state appellate court that petitioner was not "in custody" at the time of his

6            interrogation by police is AEDPA unreasonable; moreover, the statements made before

7            being advised of <u>Miranda</u> protections were material to the outcome of the case;

8        **2.**  If age is not considered, the arguments favoring petitioner's position, that he was "in

9            custody" at the time of his interrogation, are insufficient to make the state appellate

10           court's determination AEDPA unreasonable.

11   Although the issue is close enough to require the above alternative analysis, the undersigned

12   further concludes that the consideration of age was not a required factor under Supreme Court

13   jurisprudence at the time the last reasoned state court determination was made; hence, the petition

14   should be denied.

15   **I.  Procedural Background**

16           In 2009, prior to petitioner's trial in the Solano County Superior Court, petitioner filed a

17   motion to suppress his statements made during his interrogation at the Vallejo police department

18   on the grounds that (1) they "were not voluntary, (2) the police extracted the statements from

19   [petitioner] in violation of his state and federal rights pursuant to <u>Miranda v. Arizona</u>, (1966) 384

20   U.S. 436 and its progeny, (3) his state and federal rights to be free from coercive interrogation

21   (were violated), and (4) his state and federal rights to due process and against self-incrimination

22   (were violated)." Lod. Ex. No. 1 at 117-18.  The trial court denied the motion and concluded that

23   petitioner's detention was lawful, there was no evidence of coerciveness, promises, or threats

24   made by the police, statements made by petitioner were not in violation of his Fifth Amendment

25   rights, there was no miscommunication, and petitioner's statements were voluntary.  <u>Id.</u> at 197-

26   98.  After the trial, a jury found petitioner guilty of assault on a child causing death.  <u>Id.</u> at 284.

27   /////

28   /////

1  Petitioner filed an appeal in the California Court of Appeal, First Appellate District, in

2  which petitioner argued that the trial court erred when it denied his motion to suppress because he

3  was in custody when he made his initial incriminating statements and he had not yet been

4  provided his <u>Miranda</u> rights.  Resp't's Lod. Ex. No. 3, Opinion by the California Court of Appeal,

5  at 4; <u>People v. Smith</u>, No. A125912, 2010 WL 4233298, at *2 (Cal. Ct. App. Oct. 27, 2010).  The

6  appellate court found the trial court's conclusion, that petitioner was not in custody when

7  petitioner made his initial incriminating statements to the police, to be well supported.  <u>Id.</u> at 4-7.

8  Importantly, the Court of Appeal did not consider petitioner's age at the time of his interrogation

9  to determine whether he was in custody during his police interrogation for purposes of requiring

10 <u>Miranda</u> advisements.

11 Petitioner then filed a petition for review in the California Supreme Court, which was

12 summarily denied on January 12, 2011.  Resp't's Lod. Ex. No. 4, California Supreme Court

13 Denial of Petition for Review.

14 On December 13, 2011, petitioner filed his federal habeas petition in this Court.  ECF No.

15 1.  On December 20, 2011, this Court granted petitioner's motion to appoint counsel.  ECF No. 5.

16 On April 2, 2012, petitioner filed a memorandum in support of his petition.  ECF No. 17.  On

17 May 30, 2012, respondent filed an answer.  ECF No. 21.  On June 26, 2012, petitioner filed a

18 traverse and memorandum in support of his traverse.  ECF Nos. 22 & 23.

19 **II.  Factual Background**

20 The background facts of the case were summarized by the California Court of Appeal as

21 follows[2]:

22  [Petitioner] was convicted of assaulting and causing the death of
    Taniya Rose, his 18-month-old daughter.
23
24  In December 2007, Taniya lived with her mother, Tyana Rose
    (Rose), and her grandmother, Hermenia Christian in an apartment
    in Vallejo.  Rose believed that petitioner, who was 16 years old,
25  was Taniya's father.

26  /////

27  _____

28  [2]   This factual background is taken from the unpublished opinion of the California Court of
    Appeal, First Appellate District, and is presumed correct.  <u>See</u> 28 U.S.C. § 2254(e)(1).

3

[Petitioner] visited Taniya on December 12, 2007. At one point during the visit, Christian called Rose to the kitchen to teach her how to cook chicken. [Petitioner] was left alone in the bedroom with Taniya.

A few minutes later, [petitioner] came into the kitchen with Taniya saying she was not breathing. Christian took the baby and ran outside screaming for help. A neighbor gave the infant mouth to mouth resuscitation until the paramedics arrived.

The paramedics put Taniya into an ambulance and one of them tried to insert a breathing tube into her trachea. When he was unsuccessful, another paramedic inserted a laryngoscope into Taniya's mouth and saw what looked like a "real pale, white, chewed-up piece of bubble gum" in her throat. The paramedic grabbed the object with a pair of forceps and gave it a tug. He pulled out a large wad of baby wipes that had been bunched up into a ball the size of a golf ball.

When the paramedics arrived at the hospital, Taniya was not breathing and she did not have a heart rate. Taniya died about a week later when life support measures were discontinued. The cause of death was anoxic encephalopathy due to asphyxia. In lay terms, Taniya died because her brain was deprived of oxygen when a foreign body blocked her airway.

The police interviewed [petitioner] at the police station two days later on December 14, 2007. During the course of the interview, [petitioner] admitted that he was angry with Rose and that he had shoved several baby wipes down Taniya's throat.

Based on these facts, an information was filed charging petitioner with murder (§ 187), and committing an assault on a child that resulted in death. (§ 273ab.) The case proceeded to trial where jurors were unable to reach a verdict on the murder charge, but convicted him on the assault charge.

After the court sentenced [petitioner] to 25 years to life in prison, he filed the present appeal.

Lod. Ex. No. 3 at 1-2; Smith, supra, 2010 WL 4233298 at *1.

## III. Analysis

### A. Standards for a Writ of Habeas Corpus

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). An application for a writ of habeas corpus can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See

1  Wilson v. Corcoran, ___U.S.___, 131 S. Ct. 13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-

2  68, 112 S. Ct. 475 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

3       Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

4  corpus relief:

> 5  An application for a writ of habeas corpus on behalf of a person in
> 6  custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> 7
> 8  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 9
> 10  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
> 11

12       As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

13  2254(d) does not require a state court to give reasons before its decision can be deemed to have

14  been 'adjudicated on the merits.'" Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

15  Rather, "when a federal claim has been presented to a state court and the state court has denied

16  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

17  of any indication or state-law procedural principles to the contrary." Id. at 784-785, citing Harris

18  v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

19  it is unclear whether a decision appearing to rest on federal grounds was decided on another

20  basis). "The presumption may be overcome when there is reason to think some other explanation

21  for the state court's decision is more likely." Id. at 785.

22       The Supreme Court has set forth the operative standard for federal habeas review of state

23  court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable*

24  application of federal law is different from an incorrect application of federal law.'" Harrington,

25  131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state

26  court's determination that a claim lacks merit precludes federal habeas relief so long as

27  'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,

28  citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).   Accordingly, "a

1   habeas court must determine what arguments or theories supported or . . . could have supported[]

2   the state court's decision; and then it must ask whether it is possible fairminded jurists could

3   disagree that those arguments or theories are inconsistent with the holding in a prior decision of

4   this Court." Id. "Evaluating whether a rule application was unreasonable requires considering

5   the rule's specificity. The more general the rule, the more leeway courts have in reaching

6   outcomes in case-by-case determinations.'" Id. Emphasizing the stringency of this standard,

7   which "stops short of imposing a complete bar of federal court relitigation of claims already

8   rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case

9   for relief does not mean the state court's contrary conclusion was unreasonable." Id., citing

10  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

11      The undersigned also finds that the same deference is paid to the factual determinations of

12  state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

13  subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

14  decision that was based on an unreasonable determination of the facts in light of the evidence

15  presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §

16  2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

17  factual error must be so apparent that "fairminded jurists" examining the same record could not

18  abide by the state court factual determination. A petitioner must show clearly and convincingly

19  that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

20  969, 974 (2006).

21      The habeas corpus petitioner bears the burden of demonstrating the objectively

22  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

23  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002). Specifically, the petitioner "must

24  show that the state court's ruling on the claim being presented in federal court was so lacking in

25  justification that there was an error well understood and comprehended in existing law beyond

26  any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-787. "Clearly

27  established" law is law that has been "squarely addressed" by the United States Supreme Court.

28  Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008). Thus, extrapolations of

1  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

2  Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006).  The established Supreme Court

3  authority reviewed must be a pronouncement on constitutional principles, or other controlling

4  federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.

5  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

6        The state courts need not have cited to federal authority, or even have indicated awareness

7  of federal authority in arriving at their decision.  Early, 537 U.S. at 8, 123 S. Ct. at 365.  Where

8  the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the

9  federal court will independently review the record in adjudication of that issue.  "Independent

10 review of the record is not de novo review of the constitutional issue, but rather, the only method

11 by which we can determine whether a silent state court decision is objectively unreasonable."

12 Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

13        Finally, if the state courts have not adjudicated the merits of the federal issue, no

14 AEDPA deference is given; the issue is reviewed de novo under general principles of federal law.

15 Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011).

16        **B.  Petitioner's Claims**

17        In his supplemental brief filed on April 2, 2012, petitioner argues that the state appellate

18 court unreasonably applied clearly established federal law under Miranda in finding that

19 petitioner was not in custody during his pre-Miranda interrogation.  ECF No. 17 at 12.  This

20 Court looks to the last reasoned state court adjudication on the merits of petitioner's Miranda

21 claim, which was the decision of the California Court of Appeal.  See Thompson v. Runnels, 705

22 F.3d 1089, 1096 (9th Cir. 2013).  In People v. Smith, the California Court of Appeals rejected

23 petitioner's claims, agreeing with the trial court's conclusion that petitioner was not in custody

24 before he received Miranda warnings.  In doing so, the court found that the following evidence

25 was adduced at trial:

26           Officer Edward Barrientos was assigned to Vallejo High School as
            a youth services officer.  On December 14, 2007, Vallejo Police
27           Detective Sharon Fong asked Barrientos to determine whether
            [petitioner] was at school that day.    Barrientos determined
28           [petitioner] was at school and arranged to meet with him in the

                                           7

dean's office.  When [petitioner] arrived, Barrientos told him he was not under arrest and asked whether he was willing to go to the police station to answer some questions.  [Petitioner] agreed and Barrientos drove him to the station carrying on a friendly conversation on the way.

Detective Fong interviewed [petitioner] at the station.  At the beginning of the interview, Fong also told [petitioner] that he was not under arrest and that he could end the interview and leave at any time.  [Petitioner] said he understood.

The interview began at approximately 2:30 p.m. and continued for several hours.  Others participated in the interview including Taniya's grandmother Hermenia Christian, Detective Mustard, and Detective Pucci.  During the course of the interview, [petitioner] admitted that he was angry with Rose because she had told him that Taniya might not be his child.  [Petitioner] said he was "a little bit pissed" and while Taniya was sitting on his lap, he balled up some baby wipes and pushed them down her throat.

When [petitioner] implicated himself in the crime, the police moved him to a custodial interrogation room and advised him of his Miranda rights.  [Petitioner] waived those rights and the interview continued.  Again, [petitioner] admitted that he shoved baby wipes down Taniya's throat because he was angry with her mother.

[Petitioner's] actions at the police station were recorded and the trial court viewed the DVDs of the entire interview.  The court also heard testimony from witnesses who stated that [petitioner] suffers from poor hearing and that he has to rely on lip reading.  The value of this testimony was undercut by the fact that [petitioner] called his father at the conclusion of the interview, and the DVD shows [petitioner] was able to communicate with his father without any difficulty even though the phone was on a table and [petitioner] could not see his father's lips.

The trial court considering this evidence declined to suppress [petitioner's] statement explaining its decision as follows: "I find that it appears . . . from the interviews, both of Detective Fong, Detective . . . Mustard . . . Detective Pucci, I find no evidence of any coerciveness; no evidence of any promises; no evidence of any threats, and in taking into [account] the totality of the circumstances, I find that the statements he made while at the police department, while not detained . . . I don't find them to be in violation of the 5th Amendment or any other state [or] federal right."

Lod. Ex. No. 3 at 3-4; Smith, 2010 WL 4233298 at *1-*2.

The court in Smith then went on to explain its rejection of petitioner's claims, as follows:

The parties on appeal agree that the pivotal issue for purposes of this argument is whether [petitioner] was in custody when he made his initial incriminating statements to the police. Two discrete

8

inquires (sic) are essential to that determination.  First, what were the circumstances surrounding the interrogation, and second, given those circumstances, would a reasonable person have felt he was not at liberty to terminate the interview and leave.  (People v. Ochoa (1998) 19 Cal.4th 353, 401-402.)  On appeal, the trial court's factual findings with respect to the first issue must be upheld so long as they are supported by substantial evidence.  (Id. at p. 402.)  Whether a reasonable person would have felt free to terminate the interview and leave is a question of law that this court reviews de novo on appeal.  (Ibid.)

Applying this standard, we conclude the trial court's ruling was well supported.  The record here indicates that [petitioner] was told three times that he was not under arrest and that he was free to go.  The first occurred when appellant was at school.  Officer Barrientos told [petitioner] he was not under arrest and he asked [petitioner] whether he was willing to answer some questions at the police station.  The second time occurred when Detective Fong began interviewing [petitioner] at the police station.  Fong told [petitioner] that he was not under arrest and that he was free to terminate the interview and leave at any time.  The third time occurred when Detective Pucci came into the interview room to give [petitioner] a voice stress test.  [Petitioner] asked Pucci whether he could leave after the test.  Pucci said he did not know, but he then went on to tell [petitioner] yet again that he was not under arrest.  We think a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go.  We conclude the trial court ruled correctly.

Our conclusion on this point is fully consistent with prior case law.  For example in People v. Ochoa, supra, 19 Cal.4th 353, the defendant signed a statement in which he voluntarily agreed to submit to a lie detector test.  Among other things it said, "'I am taking this examination freely and voluntarily, and without any promise of reward or immunity, and without any force . . . or threat of any force.  [¶]  I clearly understand that I am not required to make any statements relative to this case.'"  (Id. at p. 402.)  Our Supreme Court ruled that someone who had signed such a statement would understand that he was not in custody.  As the court explained, "A reasonable person in defendant's position, knowing that he or she need say nothing at all, would understand that he or she would do the examiner a favor by offering to leave rather than wasting the examiner's time by sitting mute." (Ibid.)

The situation here is even more clear than Ochoa because appellant was told specifically and repeatedly that he was not under arrest and that he was free to go.  Like Ochoa we conclude a reasonable person in appellant's position would understand he was free to go.

None of the arguments appellant advances convince us the trial court erred.

[Petitioner] first relies on the fact that Detective Fong considered him to be under arrest from the point when Officer Barrientos

9

contacted him at school.   However, Detective Fong did not communicate that fact to [petitioner].  Indeed, she specifically told [petitioner] he was not under arrest and that he was free to go.  An officer's uncommunicated intent to arrest has no bearing on whether a defendant is in custody.  (Berkemer v. McCarty (1984) 468 U.S. 420, 442.)

[Petitioner] argues he was in custody because the police transported him to the police station in a patrol car and then questioned him for an extended period of time.  Both of these factors are relevant on the issue of whether a person is in custody; however, we find neither to be controlling.  While [petitioner] rode to the police station in a patrol car, he did so only after agreeing to do so and after being told specifically that he was not under arrest.  While the interview was lengthy (about 3.5 hours to the point where [petitioner] began making incriminating statements), it was similar in length to one where our Supreme Court found a defendant not to be in custody. (Cf. People v. Leonard (2007) 40 Cal.4th 1370, 1400 [a defendant who was questioned for 3.5 hours was not in custody].)   Any coercion that might otherwise have been present due to the length of the questioning was lessened by the fact that at three different points during that questioning, [petitioner] was told that he was not under arrest.

[Petitioner] argues he was in custody because the police took his backpack and phone during the questioning.  It is far from clear whether the police took [petitioner's] backpack.  The record on the first point is equivocal.  In any event, even if they did take custody of [petitioner's] backpack and phone, we see nothing that would have prevented [petitioner] from simply asking that they be returned.  We consider the point to be minor.

Next, [petitioner] contends he was in custody because during questioning, he asked twice whether he could leave.  However, the evidence [petitioner] cites does not support his argument.  The first incident occurred when [petitioner] was alone in the interview room waiting for Detective Pucci to give him a stress test.  Detective Fong stepped inside briefly to apologize for the delay.  [Petitioner] told Fong that he had basketball practice.  Fong replied that she would let Detective Mustard know and that he should "hang tight."  At no point in the interchange did [petitioner] ask to leave.

The second incident occurred shortly after Detective Pucci arrived to give [petitioner] the stress test.   As Pucci was getting his instruments ready, [petitioner] asked whether he could leave when the test was completed.  Pucci said he did not know and he asked whether [petitioner] and Mustard were finished talking.  However, Pucci then went on to tell appellant that he was not under arrest.  We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.

[Petitioner's] final argument is based on what he characterizes as "hint[s]" that are contained in passages in People v. Ochoa, supra, 19 Cal.4th at pages 400-402.  [Petitioner] contends those hints support the proposition that after a defendant has shown deceit in a

> lie detector test, the police are required to provide the defendant his Miranda rights.  We need not address the substance of the argument because we have reviewed Ochoa and do not find the hints that appellant suggests are present.
>
> We conclude the trial court correctly denied appellant's motion to suppress.

Lod. Ex. No. 3 at 4-7; Smith, 2010 WL 4233298 at *2-*4.

Petitioner contends that the California Court of Appeals relied almost exclusively on the fact that petitioner was told that he was not under arrest three times prior to and during the pre-Miranda interrogation.  ECF No. 17 at 23-25.  Petitioner claims that these statements were ineffective and disingenuous given the highly coercive and lengthy interrogation, the fact that petitioner indicated he wished to leave, and the fact that Detective Mustard took petitioner's property.  Id. at 25-32.  Also, petitioner asserts that the state appellate court erred in failing to take his youth into consideration.  Id. 33-34.  Lastly, petitioner argues that the failure to suppress the interrogation had a substantial and injurious effect in determining the jury's verdict.  Id. at 34.

In the answer, respondent counters that the state appellate court properly considered all the circumstances surrounding the interrogation and reasonably determined that petitioner's Miranda rights were not violated.  ECF No. 21-1 at 12.  Respondent also argues that the admission of petitioner's statements did not substantially influence the jury's decision.  Id. at 19-20.

**C.  Clearly Established Federal Law Under Miranda**

In Miranda, the United States Supreme Court ruled that the Fifth Amendment privilege against self-incrimination requires that a person "taken into custody or otherwise deprived of his freedom of action in any significant way. . . . must be warned that he has the right to remain silent, that any statements he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed" prior to any questioning by law enforcement officers.  384 U.S. 436, 444, 86 S. Ct. 1602 (1966); see also Stanley v. Schriro, 598 F.3d 612, 618 (9th Cir. 2010).  Law enforcement officers are required to give these warnings prior to custodial interrogations given "the compulsion inherent in custodial surroundings."  Id. at 458.  "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning

11

1    generally requires exclusion of any statements obtained."  Missouri v. Seibert, 542 U.S. 600, 608,

2    124 S. Ct. 2601 (2004) (footnote reference omitted).

3         The question before this court is whether the California Court of Appeal applied Miranda

4    in an objectively unreasonable manner when it concluded that petitioner was not "in custody"

5    during his pre-Miranda interrogation.[3]  Whether a suspect is "in custody" for purposes of Miranda

6    requires application of an objective test.  Alvarado, 541 U.S. at 662-63.  Petitioner was not

7    formally arrested prior to the time he first gave incriminating statements.  Thus, the proper

8    inquiry is whether there was a "restraint on freedom of movement of the degree associated with a

9    formal arrest" during petitioner's pre-Miranda interrogation.  Thomson v. Keohane, 516 U.S. 99,

10   112, 116 S. Ct. 457 (1995); see also Alvarado, 541 U.S. at 663.  "In determining whether a person

11   is in custody in this sense, the initial step[4] is to ascertain whether, in light of the objective

12   circumstances of the interrogation, a reasonable person would have felt he or she was not at

13   liberty to terminate the interrogation and leave."  Howes v. Fields, ___U.S.___, 132 S. Ct. 1181,

14   1189 (2012) (quotations and citations omitted).

15   /////

16   _____

17   [3]     The parties do not argue whether petitioner was being interrogated for Miranda purposes.
     See Pennsylvania v. Muniz, 496 U.S. 582, 600, 110 S. Ct. 2638 (1990) ("Interrogation for

18   purposes of Miranda includes both express questioning and words or actions that, given the
     officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably

19   should know are likely to have . . . the force of a question on the accused and therefore be
     reasonably likely to elicit an incriminating response").  Because it is abundantly clear that the

20   detectives asked questions they knew were likely to elicit an incriminating response, the
     questioning at issue is considered by this Court to be an interrogation.  Infra.

21       Also, the petitioner does not claim that the Detectives employed an impermissible two-
     step interrogation technique.  See Seibert, 542 U.S. at 613-614 (Miranda warnings inserted in the

22   midst of a coordinated and continuing interrogation are likely to mislead and deprive a defendant
     of knowledge essential to his ability to understand the nature of his rights and the consequences

23   of abandoning them).

24
     [4]     "[T]he freedom-of-movement test identifies only a necessary and not a sufficient

25   condition for Miranda custody."  Maryland v. Shatzer, 559 U.S. 98, 112, 130 S. Ct. 1213 (2010).
     In the present case, the additional step of determining "whether the relevant environment presents

26   the same inherently coercive pressures as the type of station house questioning at issue in
     Miranda" is not an issue given that petitioner was interrogated at the police station.  Howes, 132

27   S. Ct. at 1190 (the additional question is relevant where a prisoner is removed from the general

28   population for questioning).

                                                12

In determining "how a suspect would have gauged his freedom of movement, courts must examine all of the circumstances surrounding the interrogation.  Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."[5] Id. (quotations and citations omitted).  The Ninth Circuit has also identified the following factors that are relevant to the custody analysis: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." U.S. v. Bassignani, 575 F.3d 879, 883 (9th Cir. 2009).  These lists are not exhaustive, "[o]ther factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators." Id. at 884.  Furthermore, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859, citing Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). [6]

Because the custody test is general, demanding a substantial element of judgment, lower courts have latitude in applying these factors to a specific case.  Alvarado, 541 U.S. 664-665.  In addition, this Court may not grant "federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S. Ct. at 786, quoting Alvarado, 541 U.S. at 664.

/////

_____

[5]    Although the decision in Howes was made after the California Supreme Court adjudicated the merits of this case, and thus does not qualify as "clearly established law" under 20 U.S.C. § 2254(d)(1), the Supreme Court cases establishing these factors were decided prior to the California Supreme Court's decision.

[6]    The undersigned is somewhat reluctant to utilize the Ninth Circuit tests in that the Supreme Court has precluded the use of Circuit created factor tests in the AEDPA context.  Parker v.Matthews, __U.S.__, 132 S. Ct. 2148, 2155 (2012).  However, the factors set forth in Bassignani are intuitive in nature of the circumstances one would want to examine to determine whether the reasonable person would feel free to leave.  Therefore, the factors enunciated by the Ninth Circuit are fair game for analysis in the "totality of the circumstances" analysis.

1          **1. Youth as a Relevant Factor**

2                  The California Court of Appeal considered most of the factors relevant to the custody

3    analysis, as set forth by clearly established federal law.  It discussed how petitioner was

4    summoned, where the interrogation took place, the confiscation of his property, certain aspects

5    pertaining to the general surroundings and circumstances of the interrogation, the duration of the

6    interrogation, and some of the statements made during the interrogation.  Lod. Ex. No. 3 at 4-7;

7    Smith, 2010 WL 4233298 at *2-*4.  Citing Doody v. Ryan, 649 F.3d 986 (9th Cir. 2011), and

8    J.D.B. v. North Carolina, ___U.S.___, 131 S. Ct. 2394 (2011), petitioner argues that the

9    California Court of Appeal failed to consider youth as a relevant factor in the custody test.  ECF

10   No. 17 at 33.  He contends that the Supreme Court has repeatedly concluded that a suspect's

11   youth is an important component of the totality of the circumstances test.  Id.  In Doody, the

12   Ninth Circuit found that the state appellate court unreasonably applied clearly established federal

13   law when determining the voluntariness of a confession based on the totality of the surrounding

14   circumstances because it failed to consider the petitioner's youth, experience with the criminal

15   justice system, and several other factors.  649 F.3d at 1015.  However, it was not until  J.D.B.

16   (decided June 16, 2011), when the United States Supreme Court held that, as it pertains to the

17   Miranda custody test, "so long as the child's age was known to the officer at the time of police

18   questioning, or would have been objectively apparent to a reasonable officer, its inclusion in the

19   custody analysis is consistent with the objective nature of that test."  131 S. Ct. at 2406.

20                 Petitioner fails to recognize AEDPA's limitations on a district court's review of a state

21   prisoner's habeas petition and the deference owed to the state court's determination of federal

22   constitutional claims.  Doody did not involve the same issue for purposes of age consideration as

23   the "in custody" analysis presently at issue.  Doody was decided in the context of a confession's

24   voluntariness, and extrapolations of settled law to unique situations will not qualify as clearly

25   established federal law under § 2254(d)(1).  At the time of the state court decisions herein, any

26   such extrapolation to the "in custody" analysis had been specifically rejected.  Alvarado, 541 U.S.

27   at 666-668.

28   /////

14

Moreover, and again, this Court looks to the decision of the California Court of Appeal as it is the last reasoned state court adjudication on the merits of petitioner's <u>Miranda</u> claim.  <u>See</u> <u>Thompson</u>, 705 F.3d at 1096; <u>see also</u> <u>Greene v. Fisher</u>, ___U.S.___, 132 S. Ct. 38, 44 (2011) (review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits).  Federal habeas courts are required to "'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against [the Supreme] Court's precedents *as of* '*the time the state court renders its decision*.'"  <u>Greene</u>, 132 S. Ct. 44 (emphasis in original), quoting <u>Cullen v. Pinholster</u>, ___U.S.___, 131 S. Ct. 1388, 1399 (2011).  "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. <u>Wright</u>, 552 U.S. at 125.  Because <u>J.D.B.</u>, and <u>Doody</u> for that matter, were issued quite a bit after the state appellate court issued its opinion, neither case applies here.  Even if one views the summary decision of the California Supreme Court denying review as the benchmark (decision issued January 12, 2011), <u>J.D.B</u> was decided approximately six months later.  Thus, <u>J.D.B.</u> does not control the issue here unless it was merely a reiteration of a prior Supreme Court holding.

As set forth above, prior to its decision in <u>J.D.B.</u>, the Supreme Court last addressed the issue of whether a suspect's age or experience is relevant to the <u>Miranda</u> custody analysis in <u>Yarborough v. Alvarado</u>.  In that case, a plurality of the justices (comprised of Justices Kennedy, Rehnquist, Scalia, and Thomas) found that its prior opinions applying this test had "not mentioned the suspect's age, much less mandated its consideration[,]" and rejected the proposition that failing to assess the petitioner's age in the <u>Miranda</u> custody analysis was an unreasonable application of clearly established federal law.  <u>Alvarado</u>, 541 U.S. at 666.  However, the dissent (comprised of Justices Breyer, Stevens, Souter, and Ginsburg) found that a suspect's age may be a relevant factor to the custody analysis.  The dissenting opinion stated that "Alvarado's youth is an objective circumstance that was known to the police.  It is not a special quality, but rather a widely shared characteristic that generates commonsense conclusions about behavior and perception.  To focus on the circumstance of age . . . does not complicate the 'in custody' inquiry."  <u>Id.</u> at 674-675.

/////

15

1   In her concurring opinion, Justice O'Connor stated that "[t]here *may* be cases in which a

2   suspect's age will be relevant to the custody inquiry under Miranda." Id. at 669 (quotations and

3   citation omitted) (emphasis added).  However, she also joined the plurality opinion *in full*,

4   agreeing that the Supreme Court had not decided the issue .  Thus, the undersigned cannot view

5   one line—that "there may be cases" where age may be relevant—as a statement by Justice

6   O'Connor that she is joining the "age *was* relevant" position of the dissent.  Moreover, if Justice

7   O'Connor were making a considered finding that age would be relevant in the custody analysis—

8   from now on—one would expect more than a cryptic one liner to that effect.  Similarly, if Justice

9   O'Connor was affirmatively joining the dissent on the issue of age relevance, one would have

10  expected an explicit statement to that effect.

11  Justice O'Connor went on to state that because Alvarado "was almost 18 years old at the

12  time of his interview" it would be "difficult to expect police to recognize that a suspect is a

13  juvenile when he is so close to the age of the majority" and that "[e]ven when police do know a

14  suspect's age, it may be difficult to ascertain what bearing it has on the likelihood that the suspect

15  would feel free to leave." Id.  For those reasons, she found that the state court's decision was not

16  an "unreasonable application of federal law simply because it failed explicitly to mention

17  Alvarado's age." Id.

18  The undersigned is well aware of the case law which holds that a concurrence to part of a

19  plurality holding, but also including an explicit adoption in the concurrence of a point of law

20  espoused by a four-justice dissent, will qualify the concurrence and dissent as the "majority view"

21  on the specific point of law adopted.  See Danforth v. Minnesota, 552 U.S. 264, 286, 287, 128 S.

22  Ct. 1029 (2008); Abdul-Kabrir v. Quarterman, 550 U.S. 233, 253-54, 127 S. Ct. 1654 (2007);

23  Vasquez v. Hillery 474 U.S. 254, 261 n.4, 106 S. Ct. 617 (1986) (finding "unprecedented" an

24  argument that a statement of law by five justices, even if some justices were in dissent, "does not

25  carry the force of law"); Horn v. Thoratec Corp., 376 F.3d 163, 176 n.18 (3d Cir.2004) ("Thus, on

26  the state requirement issue, Justice Breyer joined with the four-member dissent to make a

27  majority.")  However, the undersigned does not view Justice O'Connor's one line statement that

28  age "may" be relevant, without more, as anything more than a hint or indication as to what Justice

16

1    O'Connor *might* do in the future.  There was not a five justice majority on the point that age is a

2    consideration for the "in custody" analysis.  At best for petitioner, the status of Justice

3    O'Connor's statement is murky, and murkiness is the antithesis of *clearly established* Supreme

4    Court law.

5          Thus, given the that the Supreme Court had not found age to be a relevant factor in the

6    custody analysis, the <u>Alvarado</u> plurality was the last word at the time the state court decisions

7    were made in petitioner's case; it cannot therefore be said that the California Court of Appeals

8    unreasonably applied clearly established federal law by failing to consider petitioner's youth

9    when making its custody determination.

10         Nevertheless, because the undersigned views the above discussion as a close call,

11   alternative analyses will be made for petitioner's case herein—one using age as a consideration,

12   and one not.

13   **D. "In Custody" Determination of the California Court of Appeals**

14         Whether a person was "in custody" for purposes of the <u>Miranda</u> rule is a mixed question

15   of law and fact.  <u>Thompson v. Keohane</u>, 516 U.S. 99, 111-112, 116 S. Ct. 457 (1995), <u>superseded</u>

16   <u>in part on other grounds by statute</u>, 28 U.S.C. section 2254(d).  Thus, the determination of the

17   Court of Appeal may not be overturned unless it was "unreasonable" in the AEDPA sense.

18         The undersigned has reviewed the transcripts and DVD's of petitioner's interrogation with

19   Detectives Fong, Mustard, and Pucci.  These DVD's were reviewed by the trial court.  Lod. Ex.

20   No. 3 at 3; <u>Smith</u>, 2010 WL 4233298 at *2.  There are some discrepancies between this evidence

21   and the factual determinations made by the state appellate court.  This evidence also establishes

22   some circumstances surrounding the interrogation that are relevant to the custody determination,

23   which were not addressed by the state appellate court.  Additionally, because the trial court

24   redacted portions of the transcript before it went to the jury, the transcripts of the interrogation are

25   not fully "accurate" transcriptions of what is clearly seen and heard on the DVD's of the

26   interrogation.[7]

27   _____

28   [7]     Respondent has lodged three DVD's of petitioner's interrogation with this Court, which
     shall be sequentially numbered.  ECF No. 25, Resp't's Lod. Ex. Nos. 6-1, 6-2, and 6-3, DVD's of

### 1. Advisements Given to Petitioner

The state appellate court stated that petitioner was "told three times that he was not under arrest and that he was free to go" and found that "a reasonable person who is told repeatedly that he is not under arrest and that he is free to go would understand that he is not under arrest and that he is free to go." Lod. Ex. No. 3 at 4-5; Smith, 2010 WL 4233298 at *3.  Upon assessing petitioner's arguments, the state appellate court reemphasized  "that at three different points during that questioning, [petitioner] was told that he was not under arrest." Lod. Ex. No. 3 at 6; Smith, 2010 WL 4233298 at *3.  This is not an entirely accurate view of the facts as established by the evidence adduced at petitioner's trial.

Petitioner was first told that he was not under arrest when he arrived in the dean's office to meet Officer Barrientos.  Lod. Ex. No. 3 at 3; Smith, 2010 WL 4233298 at *1.  However, this statement was made well before any interrogation, and its relevance to the interrogation setting is somewhat suspect.  Petitioner was told for a second time that he was not under arrest when Detective Fong walked into the room at the police station where petitioner was waiting.[8] Specifically, Detective Fong said, "I appreciate you coming down.  Um, you're not under arrest

---

Interview.  Respondent has also lodged a transcript of these interviews with this Court, which is broken into three separate sections.  ECF No. 25, Resp't's Lod. Exs. Nos. 7-1, 7-2, and 7-3, Transcript of Interview.  The sections are titled "Interview with Jovan'z Smith," Lod. Ex. No. 7-1, "Interview With Smith – DVD – 5M," Lod. Ex. No. 7-2, and "Interview With Smith – DVD – 6M," Lod. Ex. No. 7-3.  The transcripts seemingly correspond to the DVD's, but they omit portions of what can be clearly heard on the DVD's due to the redaction of content by prior to petitioner's trial.  Resp't's Lod. Ex. No. 2, Reporter's Transcript, Vol. 1, at 44:21-26.  This Court cites to these omitted portions of the DVD's to the best of its ability.

Also, the time stamps on the DVD's are inaccurate.  Based on the timestamp, the first DVD begins at 16:01:53, but when Detective Fong initiates the interview she says that it is "1431 hours."  Lod. Ex. No. 6-1; Lod. Ex. No. 7-1 at 2:48.  Correspondingly, in the top-right corner of the first transcript, the time is shown to be 2:31 pm.  Lod. Ex. No. 7-1 at 1.  Therefore, when portions of the interrogation omitted by the transcripts, this Court will cite to the hour, minute, and second corresponding to the playback time of the relevant DVD, rather than the timestamp.

[8]    The beginning of the first DVD shows petitioner in a small room at the police station, which contained a small table with a small roll of toilet paper and a phone on it, and three chairs. Lod. Ex. No. 6-1.  Again, it is unclear how much time passed between petitioner's initial contact with Officer Barrientos and petitioner being brought into this room.

or anything like that.  The door is open; you're free to leave at any time."[9]  Lod. Ex. No. 7-1 at

1:20-21.  The detective then told petitioner that he was brought to the police station so they could

investigate and make sure "nothing . . . unusual happened" the previous evening.  Id. at 1:22-43.

Roughly 57 minutes into the interview, Detective Mustard asked petitioner if he was willing to

take a lie detector test.  After hesitating, petitioner said he was willing to take the test.  This

portion of the interrogation was redacted from the transcripts but is clearly seen and heard on the

DVD.  Lod. Ex. No. 6-1 at 0:57:05.  The third time petitioner was told that he was not under

arrest was when Detective Pucci came to the room to administer the lie detector test, which he

later referred to as a computerized voice stress analyzer exam.  The entirety of the interaction

between petitioner and Detective Pucci before and during the administration of the lie detector

test was also redacted from the transcripts but is clearly seen and heard on the DVD.  Lod. Ex.

No. 6-1 at 2:24:02.  While Detective Pucci was setting up his computer, the following interaction

took place:

> Petitioner (P): (Inaudible – likely "after this") . . . will I be able to
> go home?
>
> Detective Pucci (DP): Hey, you know, I, I don't know.  Is . . . are
> you and Detective Mustard done talking?
>
> P: I don't know.
>
> DP: Okay.  Um, yeah.  You, you understand you, you're not under
> arrest, okay?
>
> P: Yeah.
>
> DP:  Okay.  You know, that's not the issue here.
>
> P: Okay.
>
> DP:  We're just trying to gather all the facts and, and, it's an
> unfortunate situation, but we just want to make sure everything, uh,
> that, that's being said is (inaudible), you know, is what happened
> and that it is an accident.  You know (inaudible) and that things
> happen, for whatever reason.  We don't know.  (Inaudible)
>
> P: Only God knows.

---

[9]      To be clear, the door was actually closed by Detective Fong when she entered the room.
Lod. Ex. No. 6-1 at 0:01:22.

1
2

       DP: Only God knows, man.  Okay?  We just want to make sure everything's alright.  So, so there may be some questions with Detective Mustard.  I don't know.  Alright?

3

       P: Okay.

4

       DP: Alright.

5   Id. at 2:24:02-2:24:48.  This statement that petitioner was not under arrest was made over 2 hours

6   and 20 minutes after Detective Fong told petitioner he was free to leave at any time.  Clearly, it

7   was not made as unambiguously as the state appellate court seems to express in its opinion.

8   These three interactions—between petitioner and Officer Barrientos, Detective Fong, and

9   Detective Pucci—are what the state appellate court relied on in finding that during the

10   interrogation petitioner was told three times that he was not under arrest and that he was free to

11   go.

12         Based on the evidence presented to the trial court, *and with respect to the interrogation*,

13   petitioner was told that he was not under arrest twice, once just before the interrogation started,

14   and once more prior to the administration of the lie detector test.  He was told that he was free to

15   leave only once, which occurred just before the interrogation started.  Normally, these

16   advisements, if considered in the abstract, would end the custody issue adverse to petitioner

17   because they were made in plain English.  But these advisements, even adding in the advisement

18   when petitioner was at school, are not the totality of the circumstances.

19         First, the omitted-from-the-transcript Pucci advisement, when viewed in its totality,

20   actually conveyed the opposite indication that a reasonable person would feel free to leave.  As

21   petitioner argues, the clarity of that statement is unquestionably problematic.  ECF No. 17 at 28-

22   29.  Detective Pucci's first response was "I don't know. . . . are you and Detective Mustard done

23   talking?"  Detective Pucci then told petitioner that he was not under arrest, but immediately

24   thereafter stated that "there may be some questions with Detective Mustard.  I don't know."

25   Assuming Detective Pucci's response was being his real state of mind, it is telling that Detective

26   Pucci did not know how to answer the question of whether or not someone that is allegedly not in

27   custody could leave, while knowing that the person is not under arrest.  If the detective did not

28   know that someone that is not under arrest is free to leave at any time, it seems doubtful that a

1    reasonable person in petitioner's position would know that.

2          A second, more likely, interpretation is also possible.  Detective Pucci did know the
3    "correct" answer—yes, you will be able to leave—but simply did not want to let a teetering
4    suspect off the hook.  Petitioner had not made any affirmative admissions up to this point;
5    however, he had made some conflicting statements and was obviously tiring at this point in the
6    lengthy interrogation.  Without some "follow-up" by the main interrogator, the interview would
7    be insufficient for prosecution purposes.  Thus, petitioner was told that he was not under arrest,
8    *but* that he should await the finishing of questions by Detective Mustard—to get all the facts out.
9    This interpretation strongly indicates that it was made to clearly discourage petitioner from
10   leaving.  A reasonable person would pick up on this discouragement.  However, the amount of
11   discouragement might be affected by age; more will be discussed on this point later.

12         The third interpretation, that of the appellate court—that Pucci's statement was simply
13   additive to the prior advisements that petitioner was free to leave is unreasonable under these
14   particular circumstances.  Here petitioner was essentially requesting that he be able to leave after
15   the test—he was told that he should await the finishing of questioning.  Although petitioner was
16   advised that he was not under arrest, the totality of the interaction is the antithesis of "free to
17   leave" and worked to counteract the previous advisements.

18         The state appellate court also neglected to account for a subsequent statement made to
19   petitioner by Detective Mustard that even more clearly negates the proposition that petitioner was
20   free to leave at any time.  While Detectives Mustard and Pucci were repeatedly stating their doubt
21   in petitioner's account of the incident at issue, Detective Mustard said, "Don't lie man.  You can't
22   leave this room lying bro."  Lod. Ex. No. 7-2 at 11:473.  This occurred over 3 hours and 20
23   minutes into the interrogation, and over 1 hour after Detecive Pucci told petitioner that he was not
24   under arrest, but that he did not know if petitioner could leave.  This is an objective circumstance
25   that, along with the state appellate court's misinterpretation or mischaracterization, makes that
26   court's finding unreasonable.

27   /////

28   /////

21

## 2. Questioning by the Victim's Grandmother

The state appellate court failed to discuss that over 1 hour and 35 minutes after the interrogation began, Heremenia Christian (hereafter "Nina"), Tyana's mother and Taniya's, the victim's, grandmother, was brought into the room where both she and the detective questioned petitioner. Lod. Ex. No. 6-1 at 1:38:41-1:54:29. After over 15 minutes of questioning, the detective left the room. Id. at 1:54:30. As soon as the detective left Nina began crying and speaking unintelligibly. She spoke about how Taniya is on life support and dying. She continued to ask petitioner what occurred the previous night. Nina was alone in the room with petitioner for 20 minutes before Detective Mustard entered the room asking petitioner whether he needed anything to drink or to use the bathroom. Id. at 2:14:47. This was the first and only time petitioner was offered a break and left the room prior to being detained hours later. Petitioner was brought back into the room by Detective Mustard roughly 1 minute and 20 seconds later. Id. at 2:15:05-2:16:28. In the experience of the undersigned reviewing interrogation transcripts, the uncontrolled questioning of a suspect by a victim's relatives in a police station is unusual, and added to a coercive atmosphere, especially if age is considered a factor in the analysis.

## 3. Elements of Coerciveness

The state appellate court concluded that the trial court's ruling that there was no evidence of any coerciveness, promises, or threats, was well-supported. Lod. Ex. No. 3 at 4; Smith, 2010 WL 4233298 at *3. However, in addition to the unrestrained questioning by the victim's relative, the state appellate court failed to account for the many instances in which Detectives Mustard and Pucci confronted petitioner with evidence of guilt, made statements regarding social and legal punishment, told petitioner how they could help him if he told the truth, [10] and, as previously mentioned, told petitioner that he could not leave the room lying. These are all objective circumstances relating to whether a reasonable person in petitioner's position would have felt free

---

[10] The undersigned recognizes that general "we can help, if you talk now" statements do not rise by themselves to coercive questioning which would invalidate a pre-Miranda confession; more specificity as to a promise of leniency is necessary. See Thompson v. Runnels, 705 F.3d 1089, 1097 (9th Cir. 2013). However, these type of statements are obviously made to induce a person into talking "now," as opposed to later, and are a factor in determining a coercive nature of the interrogation as a whole, especially if age is considered.

1  to leave.

2       In the first relevant interaction, occurring over 45 minutes into the interview, Detective

3  Mustard told petitioner:

> [O]ne of the . . . questions about . . . the baby wipe is . . . how it
> could have gotten into the kid's mouth. . . .  [U]ltimately, we'll be
> able to figure that stuff out. . . .  [T]hey'll do, you know, different
> exams of the kid. . . .  I ain't ever seen a kid ever . . . put a baby
> wipe – 'cause they taste bad. . . .  They don't taste good, so kids
> don't typically put them in their mouth. . . .  And so . . . I got some
> issues with about how that could happen. . . .  I will tell you that we
> will figure that out . . . I mean forensically. . . .  I mean we're going
> to figure this thing out. . . .  [N]ow's the time to talk about it,
> because if not . . . if we, you know, down the road we figure out
> that this or that happened, then people are gonna look at you and
> judge you as a cold-hearted son-of-a-bitch. . . .  I hope that's not the
> case, that you're not cold-hearted. . . .  I don't think you are.  You
> don't strike me as that person. . . .  I can't imagine as a 16-year-old
> the overwhelming feelings you've got . . .  [T]he truth is important
> and I need to know the truth.

12 Lod. Ex. No. 7-1 at 46:2063-52:2303.  During this predominantly monologic interaction,

13 petitioner only responded intermittently, with either "Mm-hm," "Yeah," or "Okay," until he

14 finally said "[t]hat's the truth I'm telling you.  I'm being honest.  Like I was honest with you, I'm

15 telling you the truth right now.  I'm being straight with you."  Id. at 52:2305.  Detective Mustard

16 continued to ask questions and explained that putting a hand over the mouth of the baby or a

17 similar action in order to keep "the kid quiet" "might be neglectful . . . but it's a long ways from

18 murder. . . .  I'm not saying that's what you did, and you did this and you did that.  Don't get me

19 wrong."  Id. at 53:2373-54:2416.

20       Detective Mustard then went on to discuss how forensics could assess trauma caused to

21 the child's mouth due to its size relative to the size of petitioner's hands.  Id. at 54:2420-55:2432.

22 The detective continued with another largely monologic interaction, telling petitioner:

> [T]hey're gonna know.  Why it happened – only you could tell me
> why. . . .  If that's what happened.  But if that did happen, I'm
> telling you now's the time to talk about it, because if not, they'll be
> charging your ass up with murder, and they'll charge you as an
> adult.  I'm not saying that's what happened, but what I'm telling
> you is the truth. . . .  [I]f you don't give me the truth right now and I
> come back at you later, and I tell you, 'Hey, you kow what,
> Jovan'z, A, B, C, and D,' you're going to be digging yourself a hole
> you can't get out of.  It's going to be so deep that you're just –
> you're in trouble.  You ain't there right now.  That ain't where
> you're at. . . .  You're on the surface, you're a father whose child . . .
> is in grave condition and may die.  That's you right now.  You've

23

1    got a situation where something's happened with your kid, and we
2    need to be able to explain it. . . . You don't want to get caught up
behind this in a bad way, okay. . . . Truth is what we need, and if
you've got anything in relationship to this story what you've told us
3    that ain't true, right now – right now is when we need to hear it. . . .
'Cause after this is over, it's locked up and that's it, and that is –
4    that's your story. . . . And I don't want you to make a mistake.

5  Id. 54:2444-56:2488.  Again, petitioner only responded during this interaction intermittently,

6  with either "Mm-hm," "Yeah," or "Okay," until he finally said, "I'm not making a mistake. I'm

7  being honest with you, tell you what I know and that's it." Id. at 56:2490. It was at this time

8  when Detective Mustard asked petitioner whether he was willing to take the lie detector test,

9  which is omitted from the transcript, as previously discussed. Lod. Ex. No. 6-1 at 0:57:05. After

10  petitioner agreed to take the lie detector test, the detective asked, "Can I see your phone real

11  quick? I'll just take a look at it if you don't mind." Lod. Ex. No. 7-1 at 56:2502. The detective

12  then took petitioner's phone from him and left the room with it. Lod. Ex. No. 6-1 at 0:57:20.

13       After petitioner had been in the room alone for over 40 minutes, Detective Mustard came

14  back in the room with Nina, as previously discussed. Id. at 1:38:40. He did not return

15  petitioner's phone to him at this point or at any other point in the interrogation. During this time,

16  the detective began calling into question petitioner's account of what occurred. After questioning

17  how the baby could have asked for juice with baby wipes in her mouth, the following interaction

18  took place:

19        DM: So how does that happen – h – how does the baby throw up
and this not come out?
20

21        P: I do not know. I'm honestly telling you the truth where . . .

         DM: Something's wrong.
22

23        P: I know somethin' wrong, but I – I'm – I'm honestly tellin' you
the truth.

24        DM: Something's wrong, Jovon'z.

25        P: I'm honestly telling you the truth.

26        DM: . . . You can look at me and you can tell me whatever story
you want to tell me, that's blood to that lady. . . . I ain't seen a sad
27        face in here since you've been here. Somebody drags me in here
and talks to me about my kid being dead, or dying, and whether I'm
28        responsible or not responsible, or whether I feel guilty because I

was the last one there and I was there when it happened, you'd pick me off that floor.  Are you that cold-hearted person we talked about earlier?

P: No, I'm not officer.  'Cause I did cry when I was at school, I did cry, and I also cried last night.

DM: I ain't askin' you to cry, I'm askin' for the truth.

P: I'm givin' the truth, that's all I know.  I ain't did nothin' to that baby.

. . .

DM: . . . never seen no kid chew on no baby wipe.  I don't want you to be that cold-hearted person, all right, that's not you, I know that's not you. . . .  You're 16 years old, you got a lot of livin' to do, you got a lot of responsibility. . . . It ain't fair, it ain't fair to the family, it ain't fair to her, and it ain't fair to your family and it ain't fair to you.  There ain't but one person that knows what happened and that's you. . .  [I]t's gonna come out, you're the one that's gonna have to live with it.  I've sat across from people cold hearted shot and killed people in the streets, people that are brutal killers.  I don't want people to think that of you. . . .  Is that what people should think of you?

P: No.

DM: What should people think of you?

P: I'm a good person.

DM: Help me explain to people how you're a good person then. . . . I told you this earlier and I tell you again, you gotta do the right thing, man. . . .  Somethin' happened, that baby's probably cryin', that baby's, I don't know, somethin' happened. . . .  I told you if the truth comes out today I can help you.  If it comes out tomorrow or the next day or next week I can't help you.  Today, the truth.

P: I'm telling you the truth, officer.

DM: Can you look that lady in the eye and tell her you didn't do that?

P: Mama (Nina), I did not do that.  I wouldn't hurt Taniya like that.

Lod. Ex. No. 7-1 at 63:2798-65:2899.  Soon after, Detective Mustard left Nina and the petitioner in the room.  As previously discussed, they remained in the room for over 35 minutes until the detective came back to the room offering petitioner his first and only break, which he accepted, leaving the room for roughly 1 minute and 20 seconds.

/////

1   Two minutes after petitioner came back to the room, Detective Mustard brought Detective

2   Pucci into the room to administer the lie detector test.  Lod. Ex. No. 6-1 at 2:18:44.  Detective

3   Mustard then left the room.  As previously mentioned, the entirety of the interaction between

4   petitioner and Detective Pucci, before and during the administration of the lie detector test, was

5   also omitted from the transcripts.  The detective spent over 30 minutes questioning petitioner

6   about what occurred the previous night, who his friends were, and what his future plans were.

7   After explaining how the test works and how petitioner should respond to questions for the test to

8   get accurate results, the detective administered the test two times.  He then left the room to

9   "review the charts."  Id. at 3:03:00.

10   Petitioner remained in the room, with the door left open for the first time since the

11   interrogation began, for over 20 minutes before Detectives Mustard and Pucci came back to the

12   room to discuss the results of the test.[11]  Id. at 3:03:00-3:18:04; Lod. Ex. No. 6-2 at 0:01:49.

13   Detective Mustard closed the door upon entering the room.[12]  Lod. Ex. No. 6-2 at 0:01:57.  At this

14   time, Detective Pucci began explaining the results of the lie detector test and showing the

15   petitioner the resulting graphs.  Detective Pucci told petitioner, "You gave us a really good test,

16   okay.  And I knew the volume was correct on it.  And we got really good results from it.  My

17   concerns are this . . ."  Id. at 0:03:20-0:03:27.  Detective Pucci then went on to explain how the

18   test indicated that he lied when asked "Did you do anything to harm Toniya last night?" and "Did

19   you place the baby wipe in Toniya's mouth last night?"  Id. at 0:03:52-0:05:05.

20   /////

21   /////

22   _____

[11]   Based on the timestamps at the conclusion of DVD-1 and the beginning of DVD-2, there

23   is a 3 minute and 50 second gap that is unaccounted for.

24   [12]   Detective Mustard sat in a chair that was obstructing a path to the door that seems to be
placed roughly two feet away from the edge of the table.  This chair was to petitioner's left.  Later

25   during this same portion of the interrogation, the Detective stood up and reached to grab
something from the table.  At this time, you can clearly see the Detective's gun holster on his

26   right hip, although it is not clear that his weapon was in the holster.  Lod. Ex. No. 6-2 at 0:16:11.
Regardless, a display of a firearm in this manner does not rise to the level of force that could

27   greatly reduce the voluntariness of a confession nor could it greatly increase the coerciveness of

28   an interrogation.  However, in the juvenile context, the fact is worth noting.

1    At this time, the transcript begins to account for what was said during the interrogation.

2    Detective Pucci went on to say:

3            [B]e honest with me.  If it was an accident, if she was crying, if you
             couldn't – if – if there was something that was out of your control
4            and you did something – be honest. . . .  [i]f you're lying you're
             lying to yourself . . .  Don't lie to yourself, okay . . .  But the – but
5            this is telling me otherwise, okay?  What happened last night?

6    Lod. Ex. No. 7-2 at 1:11-16.  Petitioner responded with what was generally the same story that he

7    had been telling the detectives throughout the interrogation.  However, petitioner began to alter

8    his story, but still maintained that it was an accident.  Id. at 1:18-2:76.  Detective Pucci asked why

9    he did not tell Detective Mustard that story initially, to which the petitioner responded that he

10   didn't want them to think he "was harming the baby on purpose," that he was "scared," and it was

11   his "first time being interviewed."  Id. at 4:163-173.  Soon after, the following interaction took

12   place:
             DP: I'm not calling you a liar . . .  But I believe that something else
13           happened last night.

14           P: That was – that's – that's – that's the story.  I didn't – did
             nothing else to that baby, tried to get the little wipe outta her mouth
15           and that was it.  I didn't do nothing else.  I didn't harm the baby.  I
             didn't do nothing – I love that baby very, very much.
16           DP: I'm not saying you don't, okay?  But something happened to
             that baby and she had that baby wipe shoved down her throat, okay.
17

18   Id. at 5:183-192.

19   The petitioner continued telling the detectives that the baby grabbed the wipe, she put it in

20   her mouth, it went halfway down her throat, and that he tried to get it out but must have pushed it

21   down when trying to get it out.  Id. at 5:194-198.  Detective Mustard then began to ask petitioner

22   more questions about the incident.  At one point, the detective asked whether petitioner was

23   watching TV during the incident and what station he was watching.  Id. at 9:385.  Petitioner

24   responded that he was watching BET but changed the channel to find some cartoons, also telling

25   the officers that BET was channel 70 and the channel he found cartoons playing was 54.  Id. at

26   9:388-404.  Detective Mustard continued questioning petitioner's story, to which petitioner

27   /////

28   /////

27

1    repeated an account of the incident similar to the one he previously gave.  At this time, the

2    following interaction took place[13]:

3                    DP: Wow. Jovan'z it didn't happen like that did it?

4                    P: It did happen.  I'm telling you the honest truth it did happen.

5                    DP: No, okay I – I hear what you're saying.  But it didn't happen
                     like that.
6

7                    P: It did happen.  It did happen because I turned my head around
                     and she had it in her mouth.  I turned my head – I'm – I'm telling
8                    you it did happen.

9                    DM: You didn't change the station.

10                   P: Huh?

11                   DM: You didn't change the station.

12                   P: I did change the station.

13                   DM: You did not change the station.  I just was at the house and do
                     you know what channel the TV is on – BET.

14                   P: She turned – I did turn the station.  I had a remote.  I turned it.

15                   DM: You didn't turn the station Javon'z.

16                   DP: Hey . . .

17                   DM: Don't lie man.

18                   DP: . . .  Just . . .

19                   DM: You can't leave this room lying bro.

20                   DP: . . .  What happened out there man?  Just tell me did the baby
                     do something?  Was there some circumstance behind this whole
21                   thing?

22                   P: No.

23   Lod. Ex. No. 7-2 at 11:449-478; Lod. Ex. No. 6-2 at 0:18:56-0:19:50.

24           Still, the questioning continued.  Petitioner repeated his story, causing Detective Pucci to

25   say "you already told us that."  Lod. Ex. No. 7-2 at 12:515-538.  The questioning went on with

26

27   [13]     The transcript accurately reflects what was said in this transaction, but inaccurately
     reflects which Detective was speaking.  These errors have been corrected using DVD-2, to the
28   best of this Court's ability.  Lod. Ex. No. 6-2 at 0:18:56-0:19:50.

1   the detectives asking whether petitioner was the father since Tyana had allegedly been raped by

2   her step-father; whether petitioner was upset over arguments he had with Tyana about whether or

3   not he was the father, him talking with other females, and her talking with other males; and,

4   whether petitioner had harmed the baby previously.   The detectives also continued questioning

5   petitioner about the incident with the baby, to which petitioner continued giving the same account

6   of the incident, prompting the detectives to continue stating their disbelief.

7        The turning point of the interrogation came when the following interaction took place:

8        DP: Okay.  Javon'z you seem like a really nice guy.  I'm having a
         hard time believing what you're telling me here, okay?  It doesn't
9        make sense.

10       P: I'm telling you . . .

11       DP: Because you know the thing is this man, all right?   What
         you're telling me – listen to what you're saying – you're saying that
12       she's interested in this baby wipe that's full of soap because there's
         fruit snacks in there, chewed up fruit snacks.

13

14   Id. at 19:826-834.  Towards the end of this statement by Detective Pucci, Detective Mustard

15   stood up and left the room. Lod. Ex. No. 6-2 at 0:31:20.  The subsequent interaction was initially

16   recorded by the transcript but then omitted.  However, it is clearly seen and heard on the DVD.

17   Id.  The interaction continued as follows:

18       P: It was chewed up fruit snacks on the – on the, ah, wipe . . .

19       DP: Okay . . .

20       P: Okay and I balled it up.  And then she also was spittin' it out.

21       DP: You know, again, I'm gonna go back to this (motioning to his
         computer and the lie detector test results).  You saw these graphs,
22       alright.  The questions that I posed to you were 'Did you harm her?'
         Okay.  Not did she, okay, and you said 'No.' Alright, and it showed
23       that there was deception there.  Now, that coulda' been in your
         mind when I asked you that question of 'Did you harm her?'  In the
24       back of your mind, you're like, 'Well yeah, I really did harm her.
         Not intentionally, but I harmed her.'  If that's the case.  But when I
25       asked you the question of 'Did you put the baby wipe in the baby's
         mouth?'  And you failed that. . . How, I mean, I asked you 'Did you
26       put the baby wipe in the baby's mouth?'  And you failed it, okay.

27   Id. at 0:31:20-0:32:29.  At this point, the transcript begins to accurately reflect what is seen and

28   heard on the DVD.  It is also at this point when petitioner first implicates himself.  Detective

1   Pucci said, "She didn't put that baby wipe in her mouth did she?"  Lod. Ex. No. 7-2 at 19:842.

2   To which petitioner responded, saying, "I'm gone be honest with you, yes she did but I kinda did

3   went deeper though."  Id. at 19:844.  Again, this is the first time petitioner implicated himself by

4   admitting an intentional act harming the baby, over 3 hours and 50 minutes after the interrogation

5   began.  As petitioner continued to implicate himself, Detective Mustard came back into the room.

6   Lod. Ex. No. 6-2 at 0:33:26.  The detectives continued to question petitioner about what happened

7   between him and the baby and why he did what he did.  Before the detectives left the room,

8   Detective Mustard suggested that petitioner write a letter to the baby apologizing for what he had

9   done.  Lod. Ex. No. 7-2 at 26:1147; Lod. Ex. No. 6-2 at 0:42:56.  The Detectives left the room,

10  concluding the pre-Miranda interrogation 4 hours after it began.  While writing the letter,

11  petitioner said to himself, "It was an accident."  Lod. Ex. No. 7-2 at 26:1158.

12       The second DVD concludes with petitioner still sitting in the room alone, over 4 hours

13  and 10 minutes after the interrogation began.  Lod. Ex. No. 6-2 at 0:50:33.  The timestamp at the

14  conclusion of the second DVD reads 20:14:33.  Id.  At the beginning of the third DVD, the

15  timestamp reads 21:34:47.  Lod. Ex. No. 6-3.  Neither party mentions anything that occurred

16  during this 1 hour and 20 minute gap.  The third DVD shows a different room consisting of a

17  table and three chairs, and is seemingly similar to the other room in size.  Id.  After six minutes, a

18  man, presumably an officer, walks into the room placing a canned drink and a plate of pizza on

19  the table.  Id. at 0:06:10.  Soon after, the same man brought petitioner into the room, where

20  petitioner ate and drank before resting his head and arms on the table.  Id. at 0:06:38-0:32:56.

21       When Detectives Mustard and Pucci walk into the room, Detective Mustard tells

22  petitioner:

23               I told you when we left here a few minutes ago that we were gonna
             make some calls and make some decisions about where
24           (unintelligible) to go.  Still need to talk to you.  One of the, um,
             things that's changed since the last time we talked, is that you were
25           here before of your own free will.  You can (sic) down of your own
             free will.  Since that point and time I've you back in a holding cell
26           and you've been detained.  So what that means now is, is that I
             have to read you your rights in order to talk to you anymore.  So
27           I'm gonna read you your rights and make sure you understand
             them, okay?

28

30

1   Lod. Ex. No. 7-3 at 1:14-22.  Detective Mustard then read petitioner each of his rights in turn and

2   asked petitioner if he understood, to which petitioner responded, saying, "Uh-huh."  Id. at 1:24-

3   43.  This occurred over 6 hours after the interrogation began.

4           The evidence clearly establishes that the interrogation included many elements of

5   coerciveness.  In particular, the detectives told petitioner that they could help him if he told the

6   truth; threatened petitioner with a charge of murder and being tried as an adult; made statements

7   regarding petitioner being viewed as cold-hearted and a cold-hearted son-of-a-bitch; repeatedly

8   confronted petitioner with the lie detector test results to show his guilt; repeatedly told petitioner

9   that forensic evidence would show he was lying; and, told petitioner he was not free to leave the

10  room if he was lying.  These objective facts play a substantial role in the custody determination,

11  but were not discussed by the state appellate court.

12          To be sure, the issue here is not "voluntariness" of the confession where unduly coercive

13  tactics might render a confession inadmissible.  And, to an extent, all interrogations are coercive

14  to some degree by their very nature.   However, the determination of whether one feels free to

15  leave depends, in part, on the level of coerciveness of the questioning.

16          **E.  "In Custody" Test**

17          This Court must now ascertain whether, in light of all of the objective circumstances and

18  surroundings of the interrogation, a reasonable person in petitioner's position would have felt he

19  or she was not at liberty to terminate the interrogation and leave.  See Howes, 132 S. Ct. at 1189 .

20          This custody analysis may be guided by the Supreme Court's decision in Yarborough v.

21  Alvarado, 541 U.S. 652.  In that case, the then seventeen-year-old defendant, Michael Alvarado,

22  was part of an attempted carjacking that ended in the murder of the driver of a truck.  About a

23  month after the incident, a Los Angeles County Sheriff's detective investigating the murder called

24  and left word at Alvarado's house and with his mother that she wished to speak to Alvarado.

25  Alvarado's parents accompanied him to the police station and were told to wait in the lobby while

26  the sheriff interviewed Alvarado.  Alvarado was not given Miranda warnings prior to or during

27  this interview.  He was only questioned by one officer.  Alvarado initially denied any

28  involvement in an attempted carjacking and murder even though the detective continually insisted

31

1   that Alvarado was involved stating that she had witnesses who were saying that he was involved.

2   The detective encouraged Alvarado to tell the truth.  Alvarado then admitted his participation in

3   the carjacking but denied any knowledge of a gun or the murder.  The detective again appealed to

4   Alvarado's sense of honesty and the need to bring the victim's killer to justice.  Then Alvarado

5   confessed to knowing that the other carjacker had a gun and to helping hide the gun after the

6   shooting.  Alvarado was released to go home with his parents after the two-hour interview, but

7   was charged a few months later, along with the gunman, with attempted robbery and murder.  Id.

8   at 656–58.

9        The Supreme Court found that the following facts weighed against a determination of

10  custody: Alvarado was not transported to the station by the police or required to appear at a

11  certain time; he was not threatened with arrest; his parents remained in the lobby during the

12  interview, suggesting brevity; the sheriff focused on the other suspect's crimes, not Alvarado's,

13  during the interview; he was offered several times to take a break; and the sheriff appealed to

14  Alvarado's interest in telling the truth rather than threatening him with arrest.  Id. at 664.

15  According to the Court, "[a]ll of these objective facts are consistent with an interrogation

16  environment in which a reasonable person would have felt free to terminate the interview and

17  leave."  Id. at 664-665.

18       On the other hand, the Court noted that several factors weighed in favor of finding that

19  Alvarado was in custody, including the following facts: the interview occurred at the police

20  station; the interview lasted two hours; Alvarado was not told that he was free to leave; Alvarado

21  was transported to the station by his legal guardians, not on his own accord; Alvarado's parents

22  apparently requested to be present during the interview but were rebuffed.  Id. at 665.  The Court

23  found that these facts "might reasonably have led someone in Alvarado's position to feel more

24  restricted than otherwise" and "weigh in favor of the view that Alvarado was in custody."  Id.

25       The Supreme Court ultimately rejected the notion that the state court's custody

26  determination was unreasonable, stating that the "state court's application of our law fits within

27  the matrix of our prior decision. . . .  A federal habeas court may not issue the writ simply because

28  that court concludes in its independent judgment that the state-court decision applied [the law]

1   incorrectly. Id. at 666.

2       In the present case, there are multiple factors that weigh against a determination of

3   custody. Petitioner went to the police station with Officer Barrientos willingly, at which time he

4   was told he was not under arrest, and was free to leave. Petitioner was never handcuffed.

5   Petitioner was informed by Detective Fong at the onset of the interrogation that he was not under

6   arrest and that he was free to leave at any time. Petitioner was told once more that he was not

7   under arrest during the interrogation. For the most part, the detectives questioned petitioner in a

8   friendly tone. Petitioner was allowed to leave the room once during the interview, albeit only for

9   about 1 minute and 20 seconds. Also, petitioner was given three breaks during the pre-Miranda

10  interrogation in which he was left alone in the room for 40, 2, and 20 minutes.

11      Conversely, there are numerous factors that weigh in favor of finding that petitioner was

12  in custody during his pre-Miranda interrogation. Petitioner was taken from his school to the

13  police station in the back of a police car. The detectives were aware that petitioner was 16 years

14  old and on probation, yet petitioner's parents were never informed that he was at the police

15  station being questioned.[14] During this time, petitioner was never offered to make a phone call.

16  Even more, Detective Mustard took his cell phone, never returning it to him. Thus, petitioner did

17  not have his own mode of transportation or an adult that could take him home from the police

18  station and petitioner had his property taken. Consequently, there were barriers established

19  keeping him from freely walking out of the police station.

20      Also, the pre-Miranda interrogation went on for 4 hours, in which petitioner was

21  questioned by three different detectives and the victim's grandmother. This was about two times

22  longer than the interview in Alvarado, and eight times longer than the 30 minute interview in

23  Mathiason, 429 U.S. 492. Also, petitioner was questioned by two more officers than Alvarado

24  and also by a crying member of the victim's family. During the pre-Miranda interrogation, he

25  [14]     When Nina was in the room with petitioner she asked petitioner, "You talk to you mom?"
26  Petitioner responded, saying, "I haven't talked to her." Lod. Ex. No. 7-1 at 68:3039-3041. At the
    conclusion of petitioner's interrogation, after he had been read his rights and confessed, Detective
27  Mustard asked petitioner if he would like to call his father. When petitioner's father got on the
    phone, he asked, "Where you at?" Petitioner responded, saying, "At the police department."
28  Petitioner's father then asked, "And what's going on?" Lod. Ex. No. 7-3 at 24:1036-1040.

1    was confined to the same room for all but roughly 1 minute and 20 seconds.  Furthermore,

2    petitioner was at the police station for over 6 hours before being read his <u>Miranda</u> rights and fully

3    confessing.  At this time, unlike Alvarado, he was not allowed to leave the police station and go

4    home.

5            Furthermore, relatively early in the interrogation, petitioner was told that "now's the time

6    to talk, because if not, they'll be charging your ass up with murder, and they'll charge you as an

7    adult."  Soon after, petitioner was told "if the truth comes out today I can help you.  If it comes

8    out tomorrow or the next day or next week I can't help you."[15]  This implicit threat and implicit

9    promise may be highly coercive.

10           When petitioner asked Detective Pucci if he could leave after the lie detector test, the

11   direct response was "I don't know," which was followed by a statement telling him that he was

12   not under arrest and again that the Detective did not know.  As previously discussed, if the

13   detective did not know that petitioner was free to leave because he was not under arrest, it is

14   unreasonable to assert that petitioner, or any reasonable person, would have been aware that he

15   was free to leave.  Or, the detective was stalling—hoping to keep "the fish on the line."

16   Moreover, later in the interview, petitioner was told that he could not leave the room while lying.

17   These statements, which were made during the interrogation, tend to negate the value of the three

18   times petitioner was told he was not under arrest, two of which were made before the

19   interrogation began.  They also contradict Detective Fong's statement that petitioner was free to

20   leave, which she said hours earlier at the start of the interrogation.

21           The Detectives frequently confronted petitioner with evidence of guilt.  Specifically, the

22   Detectives used the lie detector test results to show petitioner that he was lying.  They also

23   referred to forensics often when questioning petitioners account of what transpired, telling

---

24   [15]      At the end of petitioner's post-<u>Miranda</u> interrogation, roughly 5 hours after Detective

25   Mustard made this statement regarding helping petitioner if he told the truth, Detective Mustard
     asked petitioner, "Have – have we made any promises to you for you to tell us what you've told

26   us?  Have we promised you anything?"  To which petitioner responded, saying, "No."  Lod. Ex.
     No. 7-3 at 21:914-917.  This transaction, coming hours after the implicit promise, does not lessen

27   probability that the previous statement regarding helping petitioner was, to a degree, coercive at

28   the time it was said given the accompanying circumstances.

1    petitioner that it would tell them exactly what happened.  The use of lie detector test results to

2    repeatedly assert to petitioner that he was lying is highly coercive, even though the test was taken

3    willingly.  The coercive effect of this was increased by the frequent mentioning of forensic

4    evidence.

5        *If age is to be considered a factor* to determine whether a reasonable person of high

6    school age, i.e., 16, would feel free to leave, the undersigned finds that the decision of the Court

7    of Appeal to be AEDPA unreasonable *given the totality of the circumstances*.  First, the Court of

8    Appeal did not consider age in its analysis, and it is unreasonable to expect that the average 16

9    year old would feel as free to leave as the average adult.  Yes, we all know bratty teenagers who

10    act defiantly to any authority, but such teenagers, although they seem to get the attention of the

11    media and entertainment establishment, are not typical of the age.  The far more likely picture is a

12    young person who is more susceptible to influence by authority when he is in a difficult

13    situation—a susceptibility which lessens into adulthood.  There is a reason why nearly all aspects

14    of criminal law now recognize this difference, see e.g., J.D.B. [16]

15        Regardless of the three statements that petitioner was not under arrest and the one

16    statement that petitioner was free to leave at any time, if age is considered, the circumstances and

17    surroundings of petitioner's pre-Miranda interrogation conveyed a restraint on freedom of

18    movement of the degree associated with a formal arrest.  See Thomson, 516 U.S. at 112.

19    Although the initial statements about not being under arrest and "free to leave" are formidable

20    barriers to any later circumstances indicating restraint, there are several circumstances which

21    required the Miranda warnings much earlier than they were in the context where a juvenile was

22    being interrogated, including: the telling to petitioner that he needed to await the finishing of

23    questioning by Detective Mustard; the telling to petitioner that he could not leave the room

24    having told lies; the length of the interrogation; the use of the lie detector; the unrestrained

25

26

27

[16]      Although the analysis here involves the reasonable person and not petitioner's subjective beliefs, it is difficult not to observe that petitioner herein entirely fit the typical teenager paradigm, as he did as he was directed or urged to do by law enforcement *every time*—he went to the police station, answered questions at length, took a lie detector test, and did not get up and leave when he initially desired after he was urged not to do so.

28

1   interrogation by a family member; and, the coupling of "we can help you now" with a threat that

2   unless he talked, the police would be "charging your ass up with murder" and that he would be

3   "tried as an adult."  Those statements, along with the other coercive circumstances of the

4   interrogation, would convey to a reasonable juvenile in petitioner's situation that he was not free

5   to leave.[17]

6         However, *if age is not considered as a factor* in the "custody" analysis, and again focusing

7   on the totality of circumstances, the undersigned finds that fairminded jurists could disagree about

8   the outcome.  Considering all of the same circumstances, the ability of adults to understand that

9   they could leave, in light of the initial express advice in that respect, and despite the later seeming

10  retractions of that advice and the coercive circumstances of the interrogation, is greater than that

11  of a juvenile.  Moreover adults would have a greater ability to equate "not under arrest" with free

12  to leave, even when counseled to the opposite.  At the very least, an adult would have been more

13  likely to have asked for clarification from Detecive Pucci when he gave the inconsistent advice

14  than would a juvenile high schooler who did everything he was told to do in the interrogation.  In

15  addition, most adults would probably have the wherewithal to leave, as petitioner, a juvenile who

16  had not been allowed to contact his parents, did not.  The need for parental contact is also non-

17  existent in the adult case.

18        In this case, the undersigned has ultimately found that at the time of the state court

19  decisions, it was not a violation of clearly established law as set forth by the Supreme Court to not

20  consider petitioner's age when determining whether he was "in custody" for Miranda purposes.

21  Given at the time that adults and juveniles could have been considered equals in their ability to

22  understand, and act upon initial advice that they were free to leave, the undersigned finds that no

23  AEDPA error occurred.

---

[17]    Although not precisely an issue here, see footnote 3, the questioning in this case is similar
to that criticized in Missouri v. Seibert, 542 U.S. 600, 124 S. Ct. 2601 (2004) (deliberately
question until admissions are received, and *then* give Miranda warnings to seal the confession).
There is no doubt whatsoever that the detectives herein had focused upon petitioner as their
suspect, and during the pre-Miranda interrogation, the detectives would not take "no" for an
answer with respect to his criminal intent to harm the infant.  This type of two step interrogation
is especially problematic in the juvenile context.

**F.  Effect or Influence in Determining the Jury's Verdict at Trial**

This section is written for the alternative scenario where age is a factor in the "in custody" analysis.  It does not apply, of course, to the adult scenario, the one ultimately chosen by the undersigned.

Granting a writ of habeas corpus for <u>Miranda</u> error is only required if the error was not harmless.  <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 292, 111 S. Ct. 1246, 113 L.Ed.2d 302 (1991) (noting that the Courts of Appeals have uniformly held <u>Miranda</u> violations are subject to treatment as harmless error); <u>see also</u> <u>Ghent v. Woodford</u>, 279 F.3d 1121, 1126 (9th Cir. 2002). On habeas corpus review, upon finding constitutional error, a federal court must assess the prejudicial impact of constitutional error in a state court criminal trial under the "substantial and injurious  effect" standard set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 113 S. Ct. 1710, 123 L.Ed.2d   353 (1993).  <u>Fry v. Pliler</u>, 551 U.S. 112, 127 S. Ct. 2321, 168 L.Ed.2d 16 (2007).  The relevant question here is whether the <u>Miranda</u> violation "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 637 (internal quotation marks and citation omitted).

At petitioner's trial, the prosecution heavily relied on the statements petitioner made during his interrogation, both before and after he was read his <u>Miranda</u> rights.  The prosecution mentioned these statements and even played a portion of the video of petitioner's post-<u>Miranda</u> interrogation during the opening statement.  Lod. Ex. No. 2, Vol. 1, at 196.  Also, the prosecution consistently referenced the statements made during the interrogation during the closing arguments.  Lod. Ex. No. 3, Vol. 3, at 741.

Outside of the statements petitioner made during the interrogation, there was little conclusive evidence supporting a conviction.  It was undisputed that petitioner was alone in the room with the baby for some time, roughly five minutes, before informing the baby's mother and grandmother that something was wrong.  The prosecution called several witnesses that were present at the residence on the day in question, during and after the incident occurred, in order to testify; none of whom provided an eyewitness account of petitioner harming the baby.  <u>Id.</u> at 203, 221, 245, 274.  Two of the first responders testified that they saw the baby wipes that were

1    removed from the baby's throat and that there was what appeared to be blood on them.  Id. at

2    263:24, 286:25.  However, the wipes were never tested or presented at trial because they were lost

3    at the hospital.  Lod. Ex. No. 2, Vol. 2, at 307, 323-24.  In fact, there was no physical evidence

4    from the crime scene presented at trial outside of the box of baby wipes that was found at the

5    residence.  Lod. Ex. No. 2, Vol. 3, at 625.  Furthermore, there were no cuts, scrapes, or blood

6    found in the baby's mouth, throat, lungs, or stomach.  Lod. Ex. 2, Vol. 2, at 354-55, 404.

7           Respondent argues that the "evidence against petitioner was overwhelming and weighty."

8    ECF No. 21-1 at 19.  However, respondent only points to the testimony that multiple baby wipes

9    were found two and a half inches down the baby's throat, in her trachea.  Id. citing Lod. Ex. No.

10   2, Vol. 1, at 260-63, 286-87, and Vol. 2, at 307.  Respondent asserts that a child would not

11   swallow baby wipes and that no one could "accidently push two to three baby wipes down a

12   child's throat."  ECF No. 21-2 at 19-20.  First of all, despite the adult reaction to swallowing baby

13   wipes—horrible—it is not beyond the realm of possibility that an infant places many things in her

14   mouth, even baby wipes, that she might not wish to be there a short time later.  Moreover, this

15   evidence cannot be said to be overwhelming when a forensic examiner testified that the

16   resuscitation efforts probably affected the placement of the wipes.  Lod. Ex. No. 2, Vol. 2, at 396.

17   These efforts included a neighbor administering mouth-to- mouth resuscitation, a first responder

18   continuously using a bag mask valve, and a first responder attempting to intubate the baby's

19   throat using a scope, all prior to the wipes being found.  Lod. Ex. No. 2, Vol. 1, at 212, 250, 256,

20   271.

21          Due to the weight the prosecution placed on petitioner's statements made during the

22   interrogation, relative to the other evidence presented at trial, it is clear that petitioner convicted

23   himself with his pre-Miranda statements; the post-Miranda statements followed as a result; and

24   therefore, any Miranda violation would have caused a substantial and injurious effect or influence

25   in determining the jury's verdict.

26   /////

27   /////

28   /////

**IV. Conclusion**

For all of the foregoing reasons, IT IS HEREBY FOUND:

1. If age is considered a factor in the "in custody" analysis, a constitutional violation occurred on account of tardy <u>Miranda</u> advisements, and that this violation had a harmful and injurious effect on the verdict; failure to find such by the Court of Appeal was AEDPA unreasonable;

2. If age is not considered in the "in custody" analysis, the Court of Appeal was not AEDPA unreasonable in failing to find a constitutional violation based on tardy <u>Miranda</u> advisements;

3. The Court of Appeal was NOT AEDPA unreasonable in failing to utilize age as a consideration in the "in custody" analysis; and therefore

IT IS HEREBY RECOMMENDED: that petitioner's application for a writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: August 13, 2013

 /s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

39